UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

| | |
|---|---|
| *QUINTON FELTNER,* | ) |
|             Plaintiff, | ) |
| v. | ) Cause No. |
| *3M COMPANY* | ) |
|    *Serve*: CSC-Lawyers Incorporating Service Company<br>   221 Bolivar St.<br>   Jefferson City, Missouri 65101 | ) |
|             Defendant. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW Plaintiff Quinton Feltner ("Feltner or "Plaintiff"), by and through his attorneys Sandberg Phoenix & von Gontard P.C., pursuant to 28 U.S.C. §2201, and for his Complaint for Declaratory Judgment against Defendant 3M Company ("3M" or "Defendant"), states as follows:

**INTRODUCTION**

This case arises out of Defendant 3M, a multinational conglomerate with sales in excess of 32 billion dollars, attempting to oppress and unfairly restrict a former employee from gainful non-competitive employment.  3M's interpretation of Feltner's Employment Agreement containing post-employment restrictions is overly broad and simply at odds with the clear terms of the agreement.  Feltner and his new employer, Nuance Communications, have repeatedly informed 3M that Feltner will not engage in any competitive conduct, sell a competitive product, solicit 3M's customers, or disclose any 3M confidential information or trade secrets, to the extent

1

they exist. Despite this knowledge, 3M continues to harass Feltner by threatening immediate litigation if he does not immediately resign his employment with Nuance and not work in *any* capacity in the entire U.S. health care industry. It is evident that 3M will suffer no harm by Feltner's non-competitive employment with Nuance and that 3M is engaged in unprofessional bullish conduct for the sole purpose to harass and burden Feltner and prevent him from earning an honest living.

**PARTIES, JURISDICTION AND VENUE**

1.  Feltner is a citizen of the state of Arizona and resides in Missouri. Feltner's remote employment is split approximately 50/50 between the Phoenix, Arizona area and the St. Louis, Missouri area.

2.  3M is a Delaware corporation with its principal place of business in St. Paul Minnesota. 3M is licensed to perform business in the state of Missouri and employed Feltner to perform business out of the state of Missouri.

3.  This Court has jurisdiction over this matter and the parties pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq*, because an actual case or controversy exists between the parties in that there is a current dispute over the terms, enforcement, and claimed breach of an agreement, as set forth in greater detail herein.

4.  This Court further has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

5.  This Court has personal jurisdiction over 3M pursuant because it regularly transacts business in Missouri, has a registered agent in Missouri, and engages in conduct in Missouri giving rise to the facts and circumstances at issue in this lawsuit. Accordingly, 3M has sufficient minimum contacts with Missouri to satisfy any due process concerns.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### A. *Company Information About 3M and Nuance*

7.      The 3M Company is a publicly traded (MMM) American multinational conglomerate corporation operating in the fields of industry, worker safety, US health care, and consumer goods. 3M produces over 60,000 products under several brands, including adhesives, abrasives, laminates, passive fire protection, personal protective equipment, window films, paint protection films, dental and orthodontic products, electrical and electronic connecting and insulating materials, medical products, car-care products, electronic circuits, healthcare software and optical films.  3M manages its operations in five business segments: Industrial, Safety and Graphics, Health Care, Electronics and Energy, and Consumer. According to 3M's 2018 Annual Report on Form 10-K, 3M made $32.8 billion in total sales in 2018, and ranked number 95 in the Fortune 500 list of the largest United States corporations by total revenue. As of 2018, the company had approximately 93,500 employees, and had operations in more than 70 countries.

8.      3M's Health Care segment serves markets that include medical clinics and hospitals, pharmaceuticals, dental and orthodontic practitioners, health information systems, and food manufacturing and testing. Products and services provided to these and other markets include medical and surgical supplies, skin health and infection prevention products, oral care solutions (dental and orthodontic products), health information systems, inhalation and transdermal drug delivery systems, and food safety products.

9. In medical solutions, 3M is a supplier of medical tapes, dressings, wound closure products, and orthopedic casting materials, in addition to acute wound care, skin integrity and disinfecting port protection products. In addition, 3M markets a variety of surgical drapes, masks and preps, electrodes, stethoscopes, as well as sterilization assurance equipment and patient warming solutions designed to prevent hypothermia in surgical settings. Other products include drug delivery systems, such as metered-dose inhalers, transdermal skin patches and related components. Oral care solutions include restoratives, adhesives, finishing and polishing products, crowns, impression materials, preventive sealants, professional tooth whiteners, prophylaxis and orthodontic appliances, as well as digital workflow solutions to transform traditional impression food safety products that make it faster and easier for food processors to test the microbiological quality of food, and analog processes and develops and markets computer software for hospital coding and data classification, and provides related consulting services.

10. Nuance is an American computer software technology corporation that provides speech recognition, and artificial intelligence. Nuance is a pioneer in conversational AI, having spent decades innovating and optimizing how people interact with technology.  Nuance offers award-winning solutions that don't just hear and speak, they analyze, anticipate, reason and resolve.  Nuance is partnered with 85% of Fortune 100 companies across Healthcare and Enterprise companies.  Nuance operates out of two distinct divisions: Healthcare and Enterprise that offer a variety of solutions.  Nuance recently launched a platform that utilizes its omni-channel customer engagement in the health care segment for patient engagement. The patient engagement market is a market previously not serviced by Nuance and not serviced by 3M.

B.  *3M provides Feltner's employment by 3M and Employee Agreement*

11. In April 2014, Feltner was hired by M*Modal (now 3M|M*Modal), a Pittsburgh-based, clinical intelligence and documentation company.  Prior to his employment with M*Modal Feltner had worked in the health care industry since 1998 selling dictation and transcription technologies and services to health systems.  Feltner began as an account executive selling clinical documentation technology and services for the health care industry including speech-recognition software and coding solutions and tools that aid in the creation of and transcription for medical records, such as clinical documentation improvement ("CDI") and virtual physician assistant ("VPA") (collectively Documentation Technology Products").

12. In January 2019, 3M acquired M*Modal and M*Modal became a division of 3M selling the same Documentation Technology Products.  For two months thereafter, Feltner served as a Client Executive Senior that included making direct calls on customers to continue to sell Documentation Technology Products.

13. In March 2019, Feltner moved into a management role in 3M, serving as Regional Vice President over the Central Region in the M*Model Division. In this role, Feltner was responsible for managing five account executives that resulted in a substantial reduction in direct customer contact. It was the accounts executive's responsibility to manage customer accounts and to have day-to-day involvement and interactions with customers.

14. In January 2020, Feltner transferred to a Director of West Strategic Region position where he managed six account executives.  Feltner's role remained similar, in that, he managed and supported sales personnel with limited direct customer contact.

15. 3M's customer relationship management platform was readily available to all sales personnel even those without a reason to know.  3M did not maintain any security measures

to prevent access its customer contact list by any employee. However, while accessible, Feltner only accessed the information necessary to manage his direct reports.

16. At all times employed by 3M Feltner and his reports sold one product segment the Documentation Technology Products. These products sold by Feltner and his direct reports on behalf of 3M was sold and marketed to hospitals, doctors and other medical practitioners as the end user. The primary purpose of the products is to allow the practitioner to dictate and instantly transcribe a medical note regarding a patient.

17. In his capacity as a 3M employee, Feltner electronically executed an agreement entitled "3M Employee Agreement" ("Employee Agreement"), which contains post-employment restrictive covenants. A true and accurate exemplar copy of the Employee Agreement is attached hereto as *Exhibit 1*. On information and belief, the copy of the Employment Agreement executed by Feltner is in the sole possession and/or control of 3M.

18. The Employee Agreement defines "confidential information" to include proprietary information that is not generally known:

> **"CONFIDENTIAL INFORMATION"** means information, including but not limited to trade secrets, which is not generally known and is proprietary to 3M, including, by way of example and without limitation, information about processes, products, systems, services, research, development, know-how, designs, formulas, compilations, manufacturing, purchasing, accounting, personnel, engineering, marketing, merchandising, selling, leasing, servicing, finance and business operations, strategies, systems, and techniques….

*Exh. 1*, ¶ II.B.

19. The Employee Agreement defines "look back period" as the last twelve months of Feltner's employment with 3M. Exh. 1, ¶ II.D.

20. The Employee Agreement defines "conflicting product, process, system or service" as including *only* those products which are the same or similar to an existing 3M product:

> **"CONFLICTING PRODUCT, PROCESS, SYSTEM OR SERVICE"** means any product, process, system or service of any person or organization other than 3M, in existence or under development, which is the same as or similar to or otherwise competes with a 3M product, process, system or service, in existence or under development, about which [Feltner] acquire[s] Confidential Information or as to which [Feltner] had business-related dealings or exposure to specialized training and/or customer goodwill during the Look Back Period.

*Exh. 1*, ¶ II.E.

21. The Employee Agreement defines "conflicting organization" as a company selling Conflicting Products:

> **"CONFLICTING ORGANIZATION"** means any person or organization which is engaged in or about to become engaged in development, production, marketing, leasing, selling or servicing of or research regarding a Conflicting Product, Process, System or Service.

*Exh. 1*, ¶ II.F.

22. Among other items, Feltner agreed not to disclose any Confidential Information of 3M. *Exh. 1*, ¶ III.A. Feltner further agreed to return any 3M property which disclosed or embodied Confidential Information upon his resignation. *Exh. 1*, ¶ III.G.

23. The Employment Agreement contains a one-year non-competition covenant which substantial self-imposed limitations; specifically, the covenant is limited to services that *are the same or similar to those the employee provided on behalf of 3M*, *and it explicitly allows an employee to work for a 3M competitor* ("Conflicting Organization,"), provided the competitor is large and has separate and distinct divisions in order to separate the employee from any enjoined competitive products. It provides:

7

>I will not, directly or indirectly, render services to any Conflicting Organization that are the same as or similar to those services I rendered to 3M during the Look Back Period, except that I may accept employment with a large Conflicting Organization whose business is diversified (and which has separate and distinct divisions), provided 3M, prior to my accepting such employment, shall receive separate written assurances satisfactory to 3M from such Conflicting Organization and from me, that I will not render services directly or indirectly in connection with any Conflicting Product, Process, System, or Service.  The foregoing provision shall apply: (a) at all geographic areas where I performed services for 3M and/or over which I had responsibilities during the Look Back Period; and (b) at all other places globally where 3M does business or is actively pursuing business at the time I terminate employment unless I can establish by a preponderance of the evidence that the scope of Confidential Information I possess does not extend to all locations where 3M is doing business and/or actively pursuing business at the time of termination.

Exh. 1, ¶ III.H.2.

24. The parties to the Employment Agreement further agreed that for a one-year period following the termination of Feltner's employment by 3M that he would not "(a) solicit the business of any 3M customer on behalf of a Conflicting Organization, (b) divert, entice, or otherwise take away from 3M the business of any 3M customer, or attempt to do so, or (c) solicit or induce any vendor, supplier or customer of 3M to terminate or reduce its relationship with 3M." *Exh. 1*, ¶ III.H.3.

25. However, the parties agreed the non-solicitation covenant shall not apply to, *inter alia*, "a 3M customer with whom [Feltner] had no business-related contact and about whom [Feltner] obtained no Confidential Information while employed by 3M[.]" *Exh. 1*, ¶ III.H.3.

26. The parties agreed all restrictive covenants and other terms in the Employment Agreement were only enforceable to as to protect 3M's legitimate business interests and were therefore subject to Court modification as required. *Exh. 1*, ¶ VI.

C. *Feltner's resignation and employment by Nuance*

14174378.v2

27. On or about October 1, 2020, Feltner submitted a letter of resignation to 3M, indicating last day with 3M would be effective October 15, 2020. A true and accurate copy of the resignation letter is attached hereto as *Exhibit 2*.

28. Feltner made the decision to resign from 3M and accept employment with Nuance to ensure financial security for his family. In the resignation letter Feltner provided assurances to 3M that he would not sell a competitive product, solicit 3M customers, or disclose 3M confidential information and trade secrets, to the extent they exist.

29. Following his resignation from 3M, Feltner accepted a position of employment with Nuance as an Executive Leader in its Patient Engagement Group.

*D. Feltner's employment with Nuance does not involve a "Conflicting Product, Process, System or Service"*

30. In his role at Nuance, Feltner will be working in the Enterprise Division selling a patient engagement software. This software platforms provide a dynamic omni-channel customer engagement platform that provides patients with a progressive customer experience propelled by the Internet of Things. Nuance calls this the Engagement of Things™.

31. Nuance's patient engagement platform is wholly unrelated to any product offering of 3M and, consequently, Feltner will have no involvement, directly or indirectly, in selling Nuance's products that are competitive with the Documentation Technology Products.

32. Nuance does offer a product that is competitive with the provider-focused voice dictation software for which he formerly provided services for 3M. However, the sales team for that software is within a separate and distinct division of Nuance as specifically contemplated and allowed in Section III.H.2 of the Agreement. Feltner has no role in relation to that division and is not responsible for the supervision of any employee with responsibilities related to voice dictation software.

9

14174378.v2

33. 3M's extensive 60,000 product portfolio does *not* include any patient engagement platforms remotely similar to Nuance's patient engagement software and solutions. A review of 3M's website and especially its health care webpage proves this undeniable fact. See, https://www.3m.com/3M/en_US/health-care-us/.

34. The total lack of competition between 3M and Nuance in the patient engagement software market is further evidenced by the fact that 3M is nowhere to be found from the results of a Google search for "Patient Engagement Software".

35. 3M's past practice further establishes that patient engagement software is not a "Conflicting Product, Process, System, or Service".

36. In the last six months, several former 3M employees accepted employment with the patient engagement software company Kyruss. Kyruss represents itself as the "Industry-leading provider search, scheduling, and data management solutions that help health systems connect with patients." See, https://www.kyruus.com/.

37. On or about March-April of 2020, Brandon Spring former VP West Region of 3M ("Spring") resigned from 3M to accept a position with Kyruss. Spring's management webpage at Kyruss states:

> Prior to Kyruus, Spring spent 6 years with M*Modal, then 3M after its acquisition. Spring led numerous teams and initiatives while at M*Modal including commercial strategy, emerging markets, regional growth, and national/key account growth - all which contributed to the hyper and rapid growth to make M*Modal the industry leader in the space. In his last role as Vice President of Sales and Strategic Growth, Brandon oversaw the West Region and Key Accounts and was instrumental in growth and combined strategy after being acquired by 3M in 2018. https://www.kyruus.com/our-team-management#modal.

38. Despite is high level role at substantially similar responsibilities as Feltner at 3M, 3M took no action to prevent or interfere with Spring's employment with Kyruss and selling patient engagement software.

10

14174378.v2

39. On or about April-May of 2020, Evan Kirk, 3M's former account executive in the West Region was recruited by Spring to work at Kyruss. Again, 3M took no action to prevent Spring from soliciting Kirk for employment or interfered with Kirk's employment with Kyruss and from selling patient engagement solutions in the health care industry.

40. In June of 2020, Preston Haack, 3M's former account executive in the N.E. Region was recruited by Spring and began working for Kyruss selling patient engagement software. Once again, 3M took no action to prevent Spring from soliciting Haack for employment or interfered with Haack's employment with Kyruss and from selling patient engagement solutions in the health care industry.

41. Based on information and belief, Spring, Kirk and Haack all signed substantially similar employment agreements containing nearly identical post-employment restrictive covenants. Yet, 3M took no action to interfere with their employment with Kyruss.  3M did not seek to enforce their agreements because 3M knows that patient engagement software does not compete with any 3M product or service.

42. Based on the forgoing facts, Nuance's patient engagement software, the sole product under Feltner's management, is not "Conflicting Product, Process, System, or Service" is defined in the Agreement.

E. *Feltner's good-faith assurances to 3M*.

43. In compliance with the Employee Agreement, Feltner has not disclosed any 3M Confidential Information to Nuance or any other individual or entity.

44. In compliance with the Employee Agreement, Feltner has returned to 3M any and all 3M property disclosing or embodying Confidential Information upon his resignation.

45. In compliance with the Employment Agreement, Feltner has provided any product or services that is the same as or similar to those services he rendered to 3M during the Look Back Period.

46. In compliance with the Employment Agreement, Feltner has not solicited and any current or former 3M customer for any product competitive with a 3M product or service and provided assurances he would not solicit any customer.

47. In compliance with the Employment Agreement's requirement that he provide assurances in writing that he would not render services directly or indirectly in connection with any Conflicting Product, Process, or Service, Feltner's resignation letter informed 3M:

   a. Of the nature of the software product for which he would provide sales management;

   b. That 3M does not offer a competing product;

   c. That he would not be involved with any Nuance sales personnel who render services for a "Conflicting Product," as his position with Nuance is in a separate and distinct division;

   d. That he would not solicit the business of any individual employee or agent of any 3M customer with whom he had contact during the last 180 days of his employment by 3M;

   e. That he would not disclose any of 3M's confidential information or trade secrets;

   f. That he would promptly return all 3M property and documents.

   *Exh. 2*.

F. *3M's bad faith responses to Feltner's assurances and threats to Feltner and Nuance*.

12

14174378.v2

48. In response to Feltner's resignation letter and assurances 3M requested a copy of a job description of his new Nuance position and a copy of his offer letter from Nuance. Feltner complied with the request and provided his direct supervisor with the requested documents.

49. In response to its review of the documents and Feltner's written assurances, 3M sent Feltner correspondence offering terms in a "limited waiver," purporting to allow Feltner to work for Nuance but to restrict him for performing *any* services in the health care industry. A true and accurate copy of 3M's limited waiver correspondence is attached hereto as *Exhibit 3*.

50. The limited waiver also purported to impose new and previously unagreed to terms, including consent to jurisdiction and choice of law clauses mandating the parties' relationship be governed by Utah law and any dispute be decided by Utah courts, a jurisdiction with no significant relationship to the parties, and mandating joint and several liability from Nuance. *Exh. 3*.

51. 3M's interpretation of the Agreement as set forth its limited waiver is overly broad and inconsistent with clear terms of the Agreement; and exponentially expands the scope of the Employment Agreement and 3M's purported enforceable and protectible interests. 3M is attempting, essentially, to prohibit Feltner from performing *any* services in the entire healthcare industry, regardless of whether they are Conflicting Product, Process, System, or Service" or whether Feltner performed any such service on behalf of 3M.

52. To further clarify the non-competitive nature of his new employment and provide further assurance of his compliance with the Employment Agreement, Feltner further sent a letter of understanding through counsel to allow the parties to memorialize that his employment with Nuance was not competitive with 3M and did not violate any restrictive covenant contained in

13

the Employment Agreement. A true and accurate copy of the letter of understanding is attached hereto as *Exhibit 4*.

53. In response to Feltner's further assurances, both individually and through counsel, 3M has continued to assert non-existent violations of the Employment Agreement and now threatens baseless litigation against both Feltner and Nuance. A true and accurate copy of 3M's correspondence threatening litigation and prayers for injunctive relief is attached hereto as *Exhibit 5*.

54. 3M has now demanded Feltner immediately resign his position with Nuance, which involves the performance of non-competitive duties. *Exh. 5*.

55. 3M has threatened Feltner with a prayer for temporary restraining order and preliminary injunction to attempt to prohibit Feltner from performing his non-competitive duties with Nuance. *Exh. 5*.

56. 3M asserts, without explanation, that Feltner's the services are projected to provide are "identical" to the services he provided for 3M. This allegation is knowingly false because 3M knows it does not offer a patient engagement platform software. *Exh. 5*.

57. 3M asserts the patient engagement software managed by Feltner for Nuance is competitive with the virtual dictation software offered by 3M because it "utilize[s] and implement[s] virtual assistant and speech recognition technologies." *Exh. 5*.

58. Again, this statement is knowingly false. The two software are marketed to different end users (providers versus patients) and are used for entirely different purposes (medical note dictation versus interacting with one's own medical chart). The buyers at hospitals and doctors' offices are also typically different individuals in separate employment units. Most importantly, Feltner has agreed not to solicit any individual customer contact he had through 3M.

**COUNT I – DECLARATORY JUDGMENT**

59. All preceding paragraphs are incorporated by reference.

60. A justiciable controversy exists because:

    a. 3M has directly threatened litigation against Plaintiff regarding alleged breaches of the Employment Agreement, and the proper scope of the Employment Agreement;

    b. Without direction from this Court, the dispute regarding the alleged breach and proper scope of the Employment Agreement jeopardizes Feltner's ability to earn a living in his industry.

61. The Employment Agreement and/or 3M's attempts to enforce it with respect to Feltner's non-competitive activity is contrary to Missouri law, public policy, and to the public interest in Missouri and the United States.

62. Plaintiff will suffer harm and economic damage in excess of $75,000 if forced to comply with the terms ofben the Employment Agreement and/or 3M's attempts to enforce it with respect to Feltner's non-competitive activity.

WHEREFORE, Plaintiff Quinton Feltner hereby respectfully request this Court enter a judgment in their favor and against Defendant 3M Company, declaring:

   a. The Employment Agreement is not enforceable as to Feltner's non-competitive activity at Nuance;

   b. Feltner's employment by Nuance and services in relation to patient engagement software do not violate any covenant and/or any enforceable covenant in the Employment Agreement;

c. Nuance did not encourage the breach or tortiously interfere with any covenant contained in the Employment Agreement;

d. Awarding Plaintiff his reasonable attorneys' fees and costs associated with this action;

e. And any other remedy the court deems fair and just.

SANDBERG PHOENIX & von GONTARD, P.C.

By: */s/Timm W. Schowalter*
Timm W. Schowalter, #MO45831
Benjamin R. Wesselschmidt, #MO66321
600 Washington Avenue
St. Louis, MO 63101-1880
314-231-3332
314-241-7604 (Fax)
tschowalter@sandbergphoenix.com
bwesselschmidt@sandbergphoenix.com

*Attorneys for Plaintiff Feltner*

14174378.v2